IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-03-258 (1) |
| | § | C.A. No. C-05-538 |
| WAYNE PAUL BURTON, | § | |
| Defendant/Movant. | § | |

**MEMORANDUM OPINION AND ORDER GRANTING MOTION
TO VACATE, SET ASIDE, OR CORRECT SENTENCE, VACATING
CONVICTION AND SENTENCE AND ORDERING A NEW TRIAL**

Pending before the Court is Movant Wayne Paul Burton's ("Burton") amended motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. (D.E. 237).[1] On November 29, 2006, the Court held an evidentiary hearing regarding Burton's claim that he was denied effective assistance of counsel due to numerous errors by his two of the attorneys who represented him in his underlying criminal proceedings, Joseph A. Cheffo ("Cheffo") and J.E. Ramos, Jr ("Ramos").[2]

After the Court heard testimony from both Cheffo and Ramos, as well as from Mike McFarlin, a witness that Burton contends should have been called as a defense witness at

---

[1] Dockets entries refer to the criminal case, C-03-cr-258.

[2] Both men have been the subject of state bar disciplinary proceedings since the trial of this matter. According to his testimony, Cheffo gave up his license to practice law and is no longer an attorney. Ramos testified that he has been the subject of state bar disciplinary proceedings twice, and is currently under disciplinary action as a result of the second of those proceedings. According to him, his license was suspended for one year, but that the suspension had been fully probated, and he is thus currently licensed to practice law in state courts in Texas. The written information later submitted by Ramos at the Court's request actually reflects a *two*-year fully probated suspension, as does the information available to the public through the Texas State Bar's website.

1

his trial, the government agreed that Burton was denied effective assistance of counsel and that a new trial would be the appropriate remedy for the violation of Burton's constitutional rights. For the reasons set forth by the Court at the conclusion of the hearing and explained more fully herein, the Court finds that Burton was denied effective assistance of counsel and that he is entitled to a new trial.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## II. MOVANT'S ALLEGATIONS

As noted, Burton's amended § 2255 motion seeks a new trial based on the alleged deficiencies of Ramos and Cheffo. His motion sets forth the following claims:

> (1) Burton was prejudiced by the denial of his Sixth Amendment right to choice of counsel and to conflict-free counsel. Burton claims that Ramos' representation at trial deprived Burton of his attorney of choice, because he had chosen Cheffo. He claims that there existed a conflict because Ramos was more concerned about preventing discord between him and his employer, i.e., Cheffo, than about properly representing Burton;

> (2) Ramos and Cheffo failed to secure Burton a bond by failing to appear at an October 3, 2003 bond hearing, and failing to take other steps to ensure that Burton was released on bond. This subsequently led to Ramos' failure to locate a potential defense witness, Mike McFarlin, and denied Burton the opportunity to participate properly in his own defense;

> (3) Ramos was ineffective in failing to investigate government witnesses, in failing to adequately cross-examine government witnesses Zapata and Champion, and in omitting or limiting

cross-examination, thereby undermining confidence in the outcome of the trial;

(4) Ramos was ineffective because he failed to investigate Mike McFarlin, a key defense witness, and to call him at trial;

(5) Trial counsel provided ineffective assistance in failing to file a motion to suppress evidence seized as a result of the stop executed by the DPS officers on the day of Burton's arrest; and

(6) When viewed in totality under the circumstances, Ramos' performance was deficient and fell below an objective standard of reasonableness, and also resulted in prejudice to Burton.

(See generally D.E. 237).

## III. FACTUAL AND PROCEDURAL BACKGROUND

### A.   Summary of the Offense[3]

The indictment in this case arose as the result of four marijuana seizures and the follow-up investigation. Burton's arrest occurred on July 15, 2003. On that date, surveillance was established on the residence of Jose Espinosa in Hidalgo County and Burton was observed sitting inside of a tractor trailer. A Dodge pickup truck and a Chevrolet pickup truck arrived and were observed parked next to the tractor trailer. All three vehicles had their lights off. About 52 minutes after the two pickup trucks had arrived, all three vehicles turned their lights on and began to move toward the main road. The tractor trailer drove north on Highway 281. A narcotics officer, Rivera, radioed

---

[3] The information in this section is derived from Paragraphs 5-8 and 66-68 of the Presentence Investigation Report and also from Burton's amended § 2255 motion at pages 4-6, which cite to the corresponding portions of the trial transcript.

Department of Public Safety Trooper Bobby Garcia and asked him to conduct a traffic stop on the tractor-trailer. Burton was the driver and sole occupant. In response to Garcia's questions, Burton stated that he was coming from the McAllen area after picking up a load of produce. According to Garcia, he received consent to search the trailer. The search revealed 569.72 kilograms of marijuana inside the front of the trailer within boxes of rotting limes.

Before the marijuana was found, Burton told Garcia that there were problems with the limes and that he was thinking about stopping at the U.S. Border Patrol Checkpoint to have the load checked out. After Officer Rivera arrived at the scene and questioned Burton, Burton told Rivera that he thought something was wrong with the limes and that he intended to have it checked out. Burton was arrested.

A government witness, Oscar De La Rosa, was called by the Government and testified that he and Burton had both been truck drivers for Jose Espinoza. De La Rosa testified that Burton had discussed taking "a load" of marijuana because of his financial troubles. He also testified that Burton had told him he had delivered the load and had been paid.

The only other testimony at trial linking Burton to the conspiracy came from Erasmo Zapata. Zapata testified at trial that he met Burton when a tractor-trailer he was driving broke down in Poplar Bluff, Missouri in October 2002. According to Zapata, he was hauling marijuana for Champion and Botello (Burton's two co-defendants) when the truck

broke down. Zapata unloaded and delivered the marijuana. The next day, Burton arrived with Espinoza and repaired the vehicle. Zapata also testified that on two other occasions he picked up tractor trailers from Burton at a truck stop and loaded them with marijuana before returning them to the truck stop. Zapata testified that he never spoke with Burton.

Champion pleaded guilty, but testified at trial that he had marijuana dealings with Espinoza, Botello and Zapata. Champion, who was supplying the marijuana being transported, never identified Burton as being involved.

Burton testified at trial that he worked as a truck driver for Jose Espinoza and that he had never met Champion or Botello. He further testified that he had met Zapata only once in Missouri, when Espinoza took him to fix a broken-down tractor trailer. Burton further stated that on the day he was arrested, he had no knowledge that drugs were part of the load he was carrying. He also testified that, prior to being arrested and after the limes were loaded, he had become suspicious about the load, and had called Mike McFarlin, the broker on the load. According to Burton, he told McFarlin his suspicions about the load he was carrying.

**B. Criminal Proceedings**

On September 23, 2003, Burton was charged in an indictment with Botello and Champion. (D.E. 1). Burton was named in the first and third counts. Specifically, Count One charged him with possession with intent to distribute approximately 570 kilograms of

marijuana on or about July 15, 2003, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The third count charged him with conspiring to possess with intent to distribute more than 1000 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, from on or about May 1, 2001 to June 18, 2003.

Burton pleaded not guilty, and a jury trial for him and Botello was held on November 4, 5 and 6, 2003. (D.E. 53, 57, 58). Burton was represented at trial by Ramos. On November 6, 2003, the jury returned a guilty verdict as to both counts. (D.E. 61). The Court ordered the United States Probation Office to prepare a Presentence Investigation Report. (D.E. 63).

In between trial and sentencing, Burton filed several documents *pro se* complaining about Ramos and seeking a new trial or an appeal. (See D.E. 64-73). Eventually, Ramos moved to withdraw, and, after a hearing, the Court appointed Ronald Barroso to represent Burton. (D.E. 74, 89-93).

Burton was sentenced on February 26, 2004. At sentencing, the Court heard testimony from both Champion and Zapata regarding the drug amounts involved in the conspiracy. Notably, Champion testified at sentencing that to his knowledge, Burton was not involved in any of the marijuana transactions that Champion was involved in. The Court stated that it would not use uncorroborated testimony from Zapata to determine drug amounts in the case, because the Court did not believe Zapata was a credible witness.

At sentencing, the Court held Burton responsible for the load seized from him on July

15, 2003, the load in Missouri (where Burton went to fix a truck's brakes after the marijuana had been taken off the truck), and one load that De La Rosa testified Burton had told him Burton had taken to Atlanta. (D.E. 140, Sentencing Transcript ("S. Tr.") at 71-72). As a result, the Court determined that Burton's offense level was 32. Coupled with his criminal history category of I, his resulting guideline range was 121 to 151 months. (S. Tr. at 75). The government requested 135 months, and the Court sentenced Burton to 121 months in the custody of the Bureau of Prisons, to be followed by a five-year supervised release term, and imposed a $1000 fine and a $100 special assessment on each count. (S. Tr. at 75, 80-81; D.E. 124). Judgment of conviction and sentence was entered on March 5, 2004. (D.E. 127). Burton timely appealed, and the Fifth Circuit affirmed in a per curiam opinion issued November 24, 2004. (D.E. 161). The appellate court noted, however, that Burton had also included in his appeal a number of claims of ineffective assistance of trial counsel. The Fifth Circuit held that the record was not sufficiently developed for it to review those claims, but denied them "without prejudice to Burton's right to raise them in a subsequent collateral proceeding." (D.E. 161 at 3).

Burton filed his motion pursuant to 28 U.S.C. § 2255 on November 7, 2005. It is timely. His amended motion was filed on November 20, 2006,[4] and the government filed an amended response. (D.E. 237, 240). The Court has also considered the affidavit filed

---

[4] The amended motion, filed with the assistance of appointed § 2255 counsel, dropped claims against sentencing and appellate counsel, Ron Barroso, and also provided additional detail and clarification as to Burton's claims against Ramos and Cheffo. It did not add any new claims.

7

by J.E. Ramos (D.E. 198), the entirety of the record, and the testimony and evidence from the evidentiary hearing held November 29, 2006, discussed in more detail in the next section.

### C. Evidentiary Hearing

Burton was represented at the evidentiary hearing by appointed counsel Nancy Simonson. Counsel called three witness in Burton's case.[5]

#### 1. Mike McFarlin

The first witness was Mike McFarlin, the broker of the load of limes Burton was transporting on July 15, 2003, the day of his arrest. Burton alleges in his motion that McFarlin could have provided exculpatory evidence at trial, but that Ramos never investigated McFarlin, contacted him or called him as a witness.

McFarlin's testimony at the hearing supports Burton's allegation. It also supports Burton's testimony at trial and at sentencing that he had called McFarlin about the load because he was suspicious about it. In particular, McFarlin testified that, on the day Burton picked up the load, Burton telephoned him after picking up the load and told him that Burton thought something was wrong with the load. According to McFarlin, Burton told him that the limes were not in good condition, and that they were discolored. McFarlin then called

---

[5] Because the Court had heard enough to determine that Burton's constitutional rights were violated, and because the government indicated that it, too, believed that Burton was entitled to a new trial, the Court did not find it necessary to hear additional testimony from Ramos, nor from the other witnesses present to testify, Jason Libby and Ronald Barroso.

8

the shipper and informed him about the condition of the load, but the shipper told him it was a "clean-up load" and that the limes were going to be used for something other than being sold as produce. McFarlin then told Burton that if he still felt uncomfortable with transporting the load that he could either unload the produce or he could ask at the U.S. Border Patrol Checkpoint or at a weigh station to have the load inspected.

McFarlin further testified that it occasionally happens that drivers will be suspicious of a load and that his "motto" was "if in doubt, check it out." He indicated that it was normal advice for him to give to a driver to have the load checked.

### 2. Joseph A. Cheffo

Cheffo was the attorney who Burton retained to represent him. Cheffo testified that Burton and Burton's father had paid him $12,500 to represent Burton. Cheffo testified that he felt prepared to represent a federal criminal defendant on federal drug charges, although he conceded that he had no other federal cases pending at that time. Cheffo had represented himself to Burton and in documents to the Court as a former prosecutor, based on his 5-month stint in the Kleberg County Attorney's office. At the time he was retained by Burton, Cheffo had only tried one federal felony case. At the hearing, Cheffo referenced prior "acting classes" as support for his ability to try Burton's case.

With regard to Burton's claim that he had wanted Cheffo to be his attorney, and not Ramos, Cheffo admitted that he had told Burton and Burton's father that he would be Burton's trial lawyer. He never told Burton that he would not be representing him at trial.

9

Apparently, Cheffo's infant daughter was diagnosed with a birth defect several weeks after he was retained in Burton's case, and had surgery to repair the defect around the time of trial. Cheffo admits that he had a downward emotional spiral at that time and that, other than instructing his office manager to "bond out" Burton, he was never personally involved in Burton's defense. He did not think that he had done any investigation on the case.

Cheffo's recollection of the events of that period with regard to Burton's case was fuzzy, to say the least. Nonetheless, he testified that essentially what happened was that, because he was psychologically unable to handle the case, the case was reassigned to an attorney who was "federally licensed," i.e., Ramos. In response to questioning by the Court, Cheffo conceded that he did not give Burton a choice as to whether to have Ramos represent him or find another lawyer, nor did Cheffo ever convey to Burton information concerning his own personal circumstances and difficulties.

Cheffo also freely admitted that his office had made a mistake in failing to obtain bond for Burton. He conceded that there was a "big mix-up" on the bond. Although he was not sure precisely what happened that resulted in his office's failure to obtain Burton's release on bond, he explicitly took the blame for it. He also conceded that he did not review the federal court minutes of Burton's first appearance in the case, which would have informed him about the conditions and terms for obtaining bond. Indeed, he testified that he did not know there were minutes of that proceeding. He also failed to speak with either of the attorneys who had represented Burton previously.

### 3.    J.E. Ramos, Jr.

The "federally licensed" lawyer to whom Cheffo assigned Burton's case, without consulting with Burton, was Ramos. Ramos admitted that, at the time he tried Burton's case, he had never tried a federal jury case. He testified that he had believed that he was going to do the legwork in the case, but that Cheffo was trial counsel and that he was going to try the case. Ultimately, of course, it was Ramos who defended Burton at trial. Ramos has previously admitted to the Court, though, that he had told Burton that Cheffo would appear at trial, and that Burton was telling him "constantly that he wanted Mr. Cheffo to appear." (See Transcript from January 6, 2004 hearing at 5-7).

Although he was subpoenaed to bring documents relating to Burton's case with him to the evidentiary hearing, Ramos testified that the documents had been in the possession of Cheffo and were destroyed in a fire.[6] Because the Court stopped the hearing prior to the conclusion of Ramos' testimony, Ramos was not questioned regarding many of the allegations in Burton's motion, although his amended affidavit is on file as part of the record, and the Court has considered it. (See D.E. 198).

## IV. DISCUSSION

### A.    28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to

---

[6] Cheffo offered the same explanation for his failure to bring any documents related to Burton's case.

11

vacate, set aside or correct his sentence: (1) constitutional issues, (2) challenges to the district court's jurisdiction to impose the sentence, (3) challenges to the length of a sentence in excess of the statutory maximum, and (4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996). "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." United States v. Vaughn, 955 F.2d 367, 368 (5th Cir. 1992).

**B.     Ineffective Assistance of Counsel**

   **1.     Standards For Evaluating Ineffective Assistance Claims**

Burton's claims are all ineffective assistance of counsel claims and are properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. U.S. v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having

12

produced a just result." Strickland, 466 U.S. at 686. In short, the Court's obligation here is to determine whether counsel's alleged ineffectiveness denied Burton a fair trial. See id.

When determining whether performance was deficient, the inquiry is whether counsel's conduct was "reasonable considering all the circumstances." Id. at 688.

While Strickland requires deference to counsel's strategic decisions, such deference is due only when counsel has first fulfilled his duty to make reasonable investigation or a reasonable decision that makes particular investigation unnecessary. Id. at 690-91. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. Put differently, "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." Anderson v. Johnson, 338 F.3d 382, 391 (5th Cir. 2003) (citation omitted).

### 2. Burton's Claims Relating to Ramos' Failure to Locate, Interview, Subpoena and Call Mike McFarlin As A Witness

Applying these standards to Burton's case, the Court finds that Ramos' performance was deficient, that Burton suffered prejudice as a result, and that Burton's constitutional right to effective counsel was therefore violated. In particular, the Court finds that Ramos' failure to locate, interview, and subpoena McFarlin to testify, calls into serious question whether Burton received a fair trial and entitles Burton to a new trial.

McFarlin's testimony was that neither Ramos or Cheffo ever contacted him, despite

Ramos' vague allegations to the contrary.[7] McFarlin testified credibly that he did not recall ever receiving a phone call from Ramos or from any attorney for Burton, and also that he never spoke with the DEA or any DPS officer regarding Burton's phone call to him on the day of the load. Thus, the government apparently did not know about McFarlin's testimony, nor did the jury hear about it. The record of the trial clearly shows that McFarlin was never subpoenaed to testify, nor was he called as a witness. This failure, in and of itself, constitutes deficient performance. A reasonable attorney, when informed by his client of McFarlin's existence and his probable testimony, would have made the effort to contact him, interview him, and then call him as a witness.

In his affidavit, Ramos offered only one explanation for his failure to contact McFarlin. Specifically, his amended affidavit indicated that McFarlin lived in Chicago, and was therefore "outside the jurisdiction of the Court." That was Ramos' given reason for not contacting McFarlin or issuing a subpoena to obtain his testimony. (See D.E. 198 at 3).

---

[7] Ramos admitted that he prepared his affidavit without the benefit of the case file, which had been destroyed in a fire. Nonetheless, he claims that he "believes" he spoke to McFarlin, and then bases the entirety of his decision not to call him on his vague memories of the conversation, which McFarlin testified never took place. Ramos avers:

> I believe I spoke to this witness and he indicated talking to the Burton [sic]. But I do not recollect he was going to testify to anything that was going to particularly help Def Burton. I do not recollect McFarland [sic] saying Burton suspected there was anything wrong with the load. I do not believe the testimony fo [sic] McFarland would have effected [sic] the outcome of the jury trial.

(D.E. 198 at 3). Again, the Court finds McFarlin's testimony on this point far more credible than Ramos' testimony.

At the evidentiary hearing, however, McFarlin testified that he has lived in Mission, Texas for 15 or 16 years, that he has never lived in Chicago, and that he was employed by R&D Trucking until late 2004. He further testified that R&D Trucking was listed in the phone book, and that he could have been contacted at work.

Moreover, as correctly noted by Burton's § 2255 counsel, even if McFarlin lived in Chicago, he still could have been subpoenaed to testify at the trial. Se Fed. R. Crim. P. 17(e)(1) ("[a] subpoena requiring a witness to attend a hearing or a trial may be served at any place within the United States."). Ramos' purported explanation for his failure to subpoena McFarlin, therefore, is unsupported by law. This is illustrative of Ramos' overall deficiencies.

Ramos' decision not to call McFarlin was not made after a complete investigation, and Ramos has offered no explanation for his failure to investigate or call McFarlin, other than one unsupported by law. There was no "reasonable professional judgment" supporting the limitation on his investigation. See Strickland, 466 U.S. at 691; Anderson, 338 F.3d at 393  In short, his "strategic choice" not to call McFarlin, to the extent it can fairly be called a choice, rather than an omission, was simply not reasonable.

This Court reaches the same conclusion as did the Fifth Circuit in Anderson:

> [T]here is no evidence that counsel's decision to forego investigation was *reasoned* at all, and it is, in our opinion, far from *reasonable.* Counsel's failure to investigate was not "part of a calculated trial strategy" but is likely the result of either indolence or incompetence.

15

338 F.3d at 393 (internal citations omitted) (emphasis in original). For the foregoing reasons, the Court concludes that Ramos' failure to contact, locate, and interview McFarlin, and his resulting failure to call him as a witness at trial, was outside the wide range of professionally competent assistance, and was therefore deficient.

The Court also concludes that Burton suffered prejudice as a result of this deficiency. In particular, the Court finds that McFarlin was a credible and likeable witness. He has been a truck broker for many years, and was knowledgeable about his business. He also was a disinterested witness with nothing to gain by supporting Burton's version of events. If the jury had been given the opportunity to hear him, and had believed him, it is possible that the outcome of the trial would have been different, particularly given the relatively little evidence tying Burton to the conspiracy. This is especially true because the primary witness at trial implicating Burton as part of the conspiracy was Erasmo Zapata, whose testimony the Court completely discounted at sentencing.[8]

Additionally, it makes little sense that a driver who is knowingly transporting drugs with a "cover load" of limes would call the broker, who was uninvolved in the drug smuggling, and question the product being hauled and the condition of the limes. Rather, Burton's call to McFarlin suggests that Burton had concerns about the legitimacy of the load, but was not involved in the drug transaction. For all of these reasons, the Court finds

---

[8] The Court notes that it discounted Zapata's testimony after a vigorous cross-examination by both Botello and Burton's counsel, a cross-examination that could have been conducted by Ramos at trial, but was not.

16

that, but for Ramos' unprofessional errors, there is a reasonable probability, i.e., a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different. See Strickland, 466 U.S. at 694. Accordingly, there was prejudice to Burton as a result of Ramos' deficiencies. See id.

### 3. Additional Allegations of Ineffective Assistance

The Court is also very troubled by counsel's other numerous alleged deficiencies. As to many of them, the Court finds ample evidence to support a finding of deficient performance under Strickland. These include the failure to post a bond for Burton despite taking funds from his family to do so, the failure of Cheffo to inform Burton that he would not be representing him or to offer him a choice of counsel, the depositing of Burton's client funds into Cheffo's firm operating account, both attorneys' apparent lack of investigation, and Ramos' performance as counsel during trial, which the Court itself recollects as being deficient. Nonetheless, in light of both: (1) the Court's conclusion that Ramos rendered ineffective assistance of counsel with regard to his failure to investigate and call McFarlin; and (2) the government's concession that Burton received constitutionally defective counsel and is entitled to a new trial, the Court will not address his remaining claims in detail here, nor will it address whether Burton has established prejudice under Strickland as a result of the deficiencies listed above.

### V. CONCLUSION

For the foregoing reasons, the Court GRANTS Burton's § 2255 motion, VACATES

his conviction and sentence and GRANTS Burton a new trial. The case is set for criminal docket call on March 12, 2006. Additionally, as discussed at the conclusion of the evidentiary hearing, Ronald Barroso is hereby appointed to represent Burton at his trial.[9]

It is so ORDERED this 5th day of December, 2006.

_____
HAYDEN HEAD
CHIEF JUDGE

---

[9] Although Burton initially had raised complaints about Mr. Barroso's performance at sentencing and on appeal, his amended § 2255 motion did not include any such claims. (See D.E. 232, 237). Burton informed the Court at the conclusion of the evidentiary hearing that he wanted Mr. Barroso to represent him at his retrial.